UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-24346 - Civ

FÉLIX LÓPEZ-BONILLA,

    Plaintiff,

vs.

CARNIVAL CORPORATION, d/b/a
CARNIVAL CRUISE LINES,

    Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, FÉLIX LÓPEZ-BONILLA, by and through undersigned counsel, sues the Defendant, CARNIVAL CORPORATION, d/b/a CARNIVAL CRUISE LINES and in support thereof alleges:

1. Plaintiff, FÉLIX LÓPEZ-BONILLA, a citizen of the United States and a resident of Puerto Rico.

2. Defendant is and was at all times material based in Miami, Florida, and at all times material operated, conducted, engaged and/or carried on a business or business venture in Miami, Florida as a common carrier by water for hire, and, furthermore, owned, managed and/or operated the vessel known as the *Valor*. Defendant, and any and all predecessors or successors in interest, and officers, agents, servants and employees through whom said defendant acted, are collectively referred to herein as "Defendant."

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. §§1332 and 1333(1).

4. Plaintiff was issued one of Defendant's customary passenger contract of carriage tickets for a cruise aboard the *Valor* as a paying passenger for a cruise vacation. Plaintiff is no longer in possession of the ticket contract. However, the terms and conditions of the customary passenger ticket contract are available on Defendant's website.

5. Venue in this district is appropriate inasmuch as Defendant is based here and because Defendant has a forum selection clause in its customary contract of carriage requiring suit be brought here.

6. Plaintiff has complied with all conditions precedent to bringing suit, inclusive of providing timely notice in accordance with the Defendant's customary contract of carriage.

**FACTS COMMON TO ALL COUNTS**

7. On November 23, 2014, Plaintiff FÉLIX LÓPEZ-BONILLA ("LÓPEZ-BONILLA") and his common law wife Mirta Márquez Rodríguez ("Mirta") set sail on a week cruise on board the cruise ship *Valor*.

8. On November 24, 2014 at around 6:20 am, Plaintiff slipped and fell in the small bathroom of his cabin suffering severe injuries.

9. Shortly after his fall, the *Valor* arrived at its port of call in St. Thomas.

10. After falling, Plaintiff felt excruciating pain all over his body, especially in his back and around his neck. He rapidly developed black and blue bruises over different parts of his body. Plaintiff's wife Mirta contacted the infirmary at approximately 10:00 am and explained what had happened. A nurse was dispatched to their cabin and proceeded to make an examination of Plaintiff. She then walked him to the infirmary where he was examined by a doctor. The examination was limited to asking him to move his neck and extremities. At the time the only medication provided to Plaintiff was Tylenol.

11. No diagnostic scans such as x-rays, MRI or CT scans were ordered to further assess the degree of injury, nor consultations with appropriate specialists obtained.

12. On November 25, 2014, Plaintiff woke up yelling and crying in extreme pain. Again Mirta called the infirmary and was instructed to bring Plaintiff in. No medical personnel was dispatched to his cabin to bring him to the infirmary/medical facilities notwithstanding the fact that the medical personnel was aware of the accident Plaintiff had suffered. He was again examined by a doctor who advised that he only suffered bruises and prescribed Tylenol with codeine and gave him a morphine injection for the pain.

13. By Wednesday November 26, 2014, Plaintiff could no longer get up from his bed due to the extreme pain. Notwithstanding that on multiple occasions Plaintiff and Mirta requested that he be x-rayed in order to determine if he had suffered other more serious injuries, the doctor and other medical personnel of Defendant refused to do so. They insisted that he continue to take Tylenol with codeine.

14. On Friday, November 28, 2014, after again requiring medical assistance, which required that Mirta and other relatives on the cruise lift Plaintiff off the bed and take him to the infirmary on a wheel chair because the medical personnel refused to make a "house call", he was administered Percocet and Flexeril and was sent back to his cabin. He was told by the doctor that if he wasn't performing his biological waste necessities on himself that this was not an emergency.

15. On November 29, 2014, Plaintiff's pain and suffering continued and the infirmary was once again made aware of this. They were also made aware of the fact that, because Plaintiff could no longer move on his own he was performing his biological waste necessities on himself. An escort was sent to get Plaintiff at his cabin and he was again

examined by a doctor. Once again the medical personnel failed to take any x-rays, or perform a CT scan or MRI or any other form of examination other than observing Plaintiff and asking some general questions.

16. When told that Plaintiff was performing his biological necessities on himself the doctor told him that he would refer Plaintiff to the Emergency Room at a hospital on the island of St. Maarten. Inasmuch as this conversation took place at around 4:00 pm in the afternoon, and the cruise ship was to sail from port at around 4:30 – 5:00 pm, this implied that he would be left behind on this island where he did not know anyone or have any friends or relatives, nor did he know the language. He refused to be left behind inasmuch as the next day the cruise would be back in San Juan. Because of his refusal, the doctor forced Plaintiff to sign a printed form stating that he refused medical treatment because he did not want to be left behind in St. Maarten, and that he was allegedly releasing Defendant from any liability for injuries.

17. On Sunday November 30, 2014, an ambulance was waiting for Plaintiff when he disembarked in San Juan. Plaintiff was required to pay for the ambulance service because Defendant refused to do so.

18. After arriving to Puerto Rico, Plaintiff was taken to the Puerto Rico Medical Center where he was diagnosed with a cervical fracture which required a very delicate operation.

19. After leaving the Valor on November 30, 2014, Plaintiff spent approximately 10 months in hospitals and rehabilitation facilities.

20. Defendant held out its staff, including medical staff as being direct employees or its actual agents.

21. Defendant manifested to Plaintiff that its medical staff were acting as its employees and/or actual agents in various ways, including but not limited to the following:

    a. The doctor(s) and(s) nurse both worked at what the Defendant describes in its advertising as its "medical centers";

    b. The "medical centers" are owned and operated by Defendant, which pays to stock the "medical centers" with all supplies, various medicines and equipment; and

    c. The passenger is billed directly by Defendant through the passengers' Sail and Sign Card, whereas the "medical staff", including the doctor and nurse, are paid salaries by Defendant to work in the "medical centers."

22. At all material times, the medical staff in this case were given uniforms to wear which include name tags, and which have the CARNIVAL CRUISE LINES name and logo. The uniforms were required by Defendant to be worn by shipboard medical staff.

23. At all material times, a shipboard doctor is considered to be an Officer on board the vessel and a member of the crew, and was introduced to the passengers as one of the ship's Officers.

24. At all material times, the shipboard doctors and the nurses were held out to the passengers by Defendant as being members of the ship's crew.

25. At all material times, the Defendant put the ship's doctors and nurses under the command of the ship's superior officers, including the Master of the ship.

26. At all material times, the Defendant represents to immigration authorities that their doctors and nurses are members of the ship's crew.

27. At all material times, the ship's doctors and nurses are permitted to eat with the ship's crew.

28. At all material times, the Defendant held out its medical staff, including its doctors and nurses, as being its employees who work in the Defendant's "medical centers" on the vessel. Defendant promotes its medical staff and represents them as being their employees through brochures, internet advertising, and on the vessel. Defendant's exemplar ticket contract on its website indicates, in pertinent part, "[t]o the extent Passengers retain the services of medical personnel or independent contractors on or off the Vessel . . .," which suggests that medical personnel are not independent contractors.

29. At all material times, the Defendant promotes the idea that the medical staff who work in its "medical centers" are employed by the cruise line as part of a marketing tool to induce passengers such as the Plaintiffs and the Decedent to buy cruises on its ships, particularly because the cruise line goes to various foreign ports which may not have adequate medical care.  Defendant touts their "top notch medical facilities at sea" which meet and exceed all of the minimum recommendations for equipment and qualifications of the medical staff from "gold standard" set forth by the American College of Emergency Physicians.

30. When Plaintiff was seen by the shipboard doctors and nurses, based on the foregoing he believed, and was reasonable in his belief, that the shipboard doctors and nurses were acting as direct employees or actual agents on behalf of the Defendant.  Plaintiff was never given any reason to believe otherwise.

31. Plaintiff relied to his detriment on their belief that the shipboard doctors and nurses were direct employees or actual agents of the Defendant in that the Plaintiff followed the advice of the doctors and nurses.

32. As a result of the Plaintiff's reliance upon the shipboard medical staff, the Plaintiff's cervical fracture was not properly diagnosed and treated and the Plaintiff did not disembark

himself immediately upon arrival in St. Thomas to seek medical care and treatment. As result, Plaintiff is bedridden and a quadriplegic. He will likely never walk or use his hands again.

### COUNT I: NELGIGENCE

33. Plaintiff adopts and re-alleges each and every allegation contained in paragraphs 1 through 32 as though fully set forth herein, and further allege as follows:

34. Defendant owed a duty to the Plaintiff to exercise ordinary reasonable care under the circumstances for their safety and to provide reasonably safe passage under the circumstances.

35. Defendant had a duty to the Plaintiff to properly maintain and operate the *Valor*.

36. Defendant had a duty to the Plaintiff to act reasonably with respect to the health and safety of the Plaintiffs and Decedent under the circumstances.

37. Defendant had a duty to the Plaintiff to act consistent with, and comply with, all regulations and laws pertaining to the operations of cruise ships.

38. Defendant had a duty to the Plaintiff to maintain the *Valor* under the circumstances in a manner that did not threaten Plaintiff's health and safety.

39. Defendant's employees and agents owed a duty to Plaintiff to provide prompt and appropriate medical care under the circumstances following his fall and resulting cervical fracture he developed onboard the *Valor*.

40. Defendant, by and through the acts of its employees or agents, was negligent, in one or more of the following ways:

    a. Failing to properly assess the condition of Plaintiff given his habitus;
    b. Failing to timely diagnose and appropriately treat the Plaintiff;

    c. Failing to recognize and treat Plaintiff's signs and symptoms of cervical fracture;

    d. Failing to order appropriate diagnostic scans to further assess the Plaintiff's condition;

    e. Failing to obtain consultations with appropriate specialists;

    f. Failing to properly monitor the Plaintiff;

    g. Failing to evacuate the Plaintiff from the vessel for further care in a timely manner, when he first presented to the medical center and each day after;

    h. Failing to exercise the degree of care and skill of the average qualified practitioner of the arts and science of medicine; and

    i. Deviating from the standard of care for patients in Plaintiff's circumstances and who demonstrated the signs and symptoms of a cervical fracture.

41. As a direct and proximate result of the negligence of the Defendant, by and through the acts of its employees or agents, as described above, the Plaintiff suffered injuries and damages from an untreated cervical fracture.

42. Had Plaintiff received the appropriate care and treatment, it is more likely than not that he would have not have suffered the resulting spinal damages and paralysis.

43. As a direct and proximate result of the negligence of the Defendant, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and/or treatment, transportation costs, loss of earnings, loss of the ability to earn money, and/or an aggravation of a previously existing condition. All or part of the Plaintiff's losses are permanent and/or continuing in nature and Plaintiff shall continue to suffer from those losses in the future.

44. WHEREFORE, the Plaintiff demands judgment for damages against the Defendant, together with applicable costs, and any other relief deemed just and appropriate by this Honorable Court, and further demands trial by jury of all issues so triable.

**COUNT II: ALTERNATIVE NEGLIGENCE BASED UPON APPARENT AGENCY**

45. Plaintiff adopts and re-alleges each and every allegation contained in paragraphs 1 through 32 as though fully set forth herein, and further allege as follows:

46. Alternatively, Defendant's apparent agents owed a duty to Plaintiff to provide prompt and appropriate medical care under the circumstances following his fall and resulting cervical fracture he developed onboard the *Valor*.

47. Alternatively, Defendant, by and through the acts of its apparent agents, was negligent, in one or more of the following ways:

    a. Failing to properly assess the condition of Plaintiff given his habitus;

    b. Failing to timely diagnose and appropriately treat the Plaintiff;

    c. Failing to recognize and treat Plaintiff's signs and symptoms of cervical fracture;

    d. Failing to order appropriate diagnostic scans to further assess the Plaintiff's condition;

    e. Failing to obtain consultations with appropriate specialists;

    f. Failing to properly monitor the Plaintiff;

    g. Failing to evacuate the Plaintiff from the vessel for further care in a timely manner, when he first presented to the medical center and each day after;

    h. Failing to exercise the degree of care and skill of the average qualified practitioner of the arts and science of medicine; and

      i. Deviating from the standard of care for patients in Plaintiff's circumstances and who demonstrated the signs and symptoms of a cervical fracture.

48. Alternatively, as a direct and proximate result of the negligence of the Defendant, by and through the acts of its apparent agents, as described above, Plaintiff suffered injuries and damages from an untreated cervical fracture.

49. Had Plaintiff received the appropriate care and treatment, it is more likely than not that he would have not have suffered the resulting spinal damages and paralysis.

50. As a direct and proximate result of the negligence of the Defendant, by and through the acts of its apparent agents, as described above, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and/or treatment, transportation costs, loss of earnings, loss of the ability to earn money, and/or an aggravation of a previously existing condition. All or part of the Plaintiff's losses are permanent and/or continuing in nature and Plaintiff shall continue to suffer from those losses in the future.

51. WHEREFORE, the Plaintiff demands judgment for damages against the Defendant, together with applicable costs, and any other relief deemed just and appropriate by this Honorable Court, and further demands trial by jury of all issues so triable.

### COUNT III: NEGLIGENT HIRING AND RETENTION

52. Plaintiff adopts and re-alleges each and every allegation contained in paragraphs 1 through 32 as though fully set forth herein, and further allege as follows:

53. At all times material, it was foreseeable to the Defendant, that passengers like the Plaintiff would develop cervical or other similar injuries on the cruise which would result in the presentation of similar signs and symptoms.

54. At all times material, it was foreseeable to the Defendant that such injuries would occur and require proper examination and evaluation, including appropriate triage in the event that the illness would require shore side examination, diagnostic testing, evaluation and treatment.

55. At all times material, the Defendant owed a duty to use reasonable care under the circumstances in the hiring and retention of all medical personnel, including the ship's doctors and nurses.

56. At all times material, the Defendant had a duty to hire medical personnel who were adequately qualified, trained and experienced to work aboard ships and to conduct examinations and evaluations of cervical injuries which would require treatment aboard ships or which might require further evaluations and/or treatments by shore side facilities and/or shore side physicians.

57. The shipboard doctor failed to apprehend and implement fundamental basic medical care needs, including but not necessarily limited to the following ways:
    a. Failing to properly assess the condition of Plaintiff given his habitus;
    b. Failing to timely diagnose and appropriately treat the Plaintiff;
    c. Failing to recognize and treat Plaintiff's signs and symptoms of cervical fracture;
    d. Failing to order appropriate diagnostic scans to further assess the Plaintiff's condition;
    e. Failing to obtain consultations with appropriate specialists;

    f. Failing to properly monitor the Plaintiff;

    g. Failing to evacuate the Plaintiff from the vessel for further care in a timely manner, when he first presented to the medical center and each day after;

    h. Failing to exercise the degree of care and skill of the average qualified practitioner of the arts and science of medicine; and

    i. Deviating from the standard of care for patients in Plaintiff's circumstances and who demonstrated the signs and symptoms of a cervical fracture.

58. Defendant breached its duty of care with regard to the hiring and/or retention of the ship's doctor and nurses in one or more of the following manner:

    a. Defendant negligently failed to conduct an appropriate investigation into the backgrounds of the shipboard medical staff, including the doctors and nurses, to determine if they were qualified to practice emergency medicine and to handle examinations and evaluations of cervical injuries;

    b. Defendant negligently failed to hire shipboard medical staff, including the doctors and nurses, that had appropriate training and/or experience in emergency medicine, including evaluation of cervical injuries;

    c. Defendant negligently failed to hire shipboard medical staff, including the doctors and nurses, which were qualified and/or sufficiently trained and experienced in the use of diagnostic equipment that was aboard the vessel, which could have been used for diagnostic testing and evaluation of Plaintiff's injury; and

    d. Defendant negligently failed to provide appropriate training and procedures to the shipboard medical staff, including the doctors and nurses, for use of the ship's equipment for diagnostic testing.

59. Defendant negligently retained the shipboard medical staff, including the doctors and nurses, without providing appropriate training and procedures for triage and referral to shore side facilities or physician.

60. Defendant's shipboard doctors exhibited failures to apprehend and implement the most fundamental of basic medical care needs which clearly demonstrates ample evidence that the shipboard doctors were not qualified to be hired by the Defendant.

61. Defendant knew or should have known of the unfitness of the shipboard medical staff prior to the subject incident given the shipboard medical staff, including the doctors and nurses, job performance reviews and/or prior complaints or incidents of similar unfitness.

62. Defendant's shipboard doctors exhibited failures to apprehend and implement the most fundamental of basic medical care needs which clearly demonstrates ample evidence that the shipboard doctors were not properly trained.

63. As a direct and proximate result of the negligence of the Defendant, the Plaintiff did not receive competent medical care and it is more likely than not that he would have not have suffered the resulting spinal damages and paralysis.

64. As a direct and proximate result of the negligence of the Defendant, by and through the acts of its apparent agents, as described above, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and/or treatment, transportation costs, loss of earnings, loss of the ability to earn money, and/or an aggravation of a previously existing condition. All or part of the Plaintiff's losses are permanent and/or continuing in nature and Plaintiff shall continue to suffer from those losses in the future.

65. WHEREFORE, the Plaintiff demands judgment for damages against the Defendant, together with applicable costs, and any other relief deemed just and appropriate by this Honorable Court, and further demands trial by jury of all issues so triable.

Respectfully submitted,

**Crewmember & Maritime Advocacy Center**
66 West Flagler Street, Suite 200
Miami, Florida 33131
Telephone:  (305) 374-9099
Facsimile:  (305) 374-5099
Julio J. Ayala, Esq.
Florida Bar No. 0977070
crewesq@crewadvocacy.com

-AND-

**BRILL & RINALDI, THE LAW FIRM**
17150 Royal Palm Boulevard, Suite 2
Weston, FL 33326
Telephone:  (954) 876-4344
Facsimile:  (954) 384-6226

*s/ Joseph J. Rinaldi, Jr., Esq.*
**David W. Brill, Esq.**
Florida Bar No.:  959560
Primary e-mail:  david@brillrinaldi.com
Secondary e-mail:  yamile@brillrinaldi.com
**Joseph J. Rinaldi, Jr., Esq.**
Florida Bar No.:  581941
Primary e-mail:  joe@brillrinaldi.com
Secondary e-mail:  yamile@brillrinaldi.com